# TULARE IRRIGATION DISTRICT et al.

## vs.

# LINDSAY - STRATHMORE IRRIGATION DISTRICT

## SUPERIOR COURT, COUNTY OF TULARE.

### ( Visalia Water Case )

#### 1924.

Suit by the Tulare Irrigation District and others against the Lindsay-Strathmore Irrigation District. Stay of judgment and continuation of temporary injunction with full protection to the parties for five years granted, provided, they notify the court within two weeks of intention to try to work out plan for adequate supply of water for both plaintiffs and defendant as suggested by the opinion.

1. WATERS AND WATERCOURSES — IRRIGATION — POLICY OF DISTRIBUTION.

The declared policy of the state strongly favors the use of its waters over as great an area of its arid sections as is consistent with economical practices.

2. WATERS AND WATERCOURSES — IRRIGATION — SUPPLY EVIDENCE.

Evidence held to show that a watergathering area supplemented by rainfall of the valley territory affords sufficient water for both plaintiffs and defendants except in very dry years.

3. WATERS AND WATERCOURSES — IRRIGATION — DEFENDANT'S PUMPING HELD TO DEPLETE PLAINTIFFS' SUPPLY.

In a proceeding to enjoin defendant irrigation district from pumping water, facts held to show that such pumping caused seepage depriving plaintiffs of needed water.

4. WATERS AND WATERCOURSES — IRRIGATION — INJUNCTION — PRIOR RIGHTS.

In an injunction suit evidence held to show that defendant's pumping water at the place in question would secure to the defendant the first and only certain water right to a varying supply at the expense of plaintiffs, who are prior appropriators,

without furnishing any practical method of diverting water to defendant when not needed by plaintiffs, making such pumping unlawful.

5.  WATERS AND WATERCOURSES — IRRIGATION — SUPPLY — COMPROMISE.

The court will not require or permit one fairly irrigated section to yield water to another section in such manner or at such times as to make two poorly or scantly irrigated sections, but will stay proceedings with full protection to the parties and continue a temporary injunction to permit the parties to work out a plan suggested by the court to furnish both, if possible, with an adequate water supply.

---

**Albert Lee  Stephens, Judge.**

---

## In the Superior  Court  of  the  State  of  California

### In and for the County of Tulare.

Tulare Irrigation District, et al. vs. Lindsay-Strathmore Irrigation District.

Kaweah River watershed is a broad section of the western slope of the Sierra Nevada Mountains, consisting of about 600 square miles.    The river by that name becomes a considerable stream at a small, low elevation mountain settlement, called Three Rivers, about 35 miles easterly of Visalia in Tulare County, and runs about 10 miles westerly through a wide, rocky canyon and a short distance beyond the foothills to McKay Point, where it divides over a cement weir. It is a typical California torrential stream, running low in late summer and winter, and high with great fluctuation with snow-melting weather in the spring months.    The Kaweah (by that name) continues in a southwesterly direction and at about 4 or 5 miles east of Visalia assumes the name of Mill Creek.

The St. Johns, the other branch, was cut off the main river about the year 1862, by an accidental obstruction.    It flows a little north of westerly and hugs closely the red tight soils that extend westerly

from the foothills by the Kaweah River. The St. Johns changes its name just east of where it is crossed by the S. P. R. R. near Goshen, becoming Cross Creek, continues to flow westerly a short distance, then flows southerly into what is called the Lakeside country and in flood periods reaches Tulare Lake.

Outside Creek takes out of the Kaweah west of McKay Point, flows southwesterly, hugging the red soils on the south, though not so closely as does the St. Johns on the north. It takes but little imagination to see the space between the St. Johns and Outside Creek as a fan spreading from a narrow handle (about 2 miles across) above McKay Point to the shores of Tulare Lake, thirty miles to the west of McKay Point. The extreme breadth of this plain is about 20 miles. This territory is a very productive agricultural, stock and dairy country, and a large portion is irrigated from the natural streams and the ditches running from these two main branches of Kaweah River.

The owners of some of these ditches, riparian land owners, and overlaying land owners are the plaintiffs herein. Then there are some riparian intervenors, and Mrs. M. R. Gray with her complaint, and all of these, for convenience, may be generally referred to as plaintiffs.

Southerly about 15 or 20 miles from The Rancho, and situated on the red lands out of the Kaweah gathering and distributing watershed, is the Lindsay-Strathmore Irrigation District, consisting of about 15,000 acres, more than half of which is now planted to producing citrus orchard. This is an incorporated irrigation district and is the defendant herein.

In 1916 when the construction on the project to take water from The Rancho to the District was started, there were about 7000 acres of citrus fruits planted in the District, and the depth of water from the surface of the ground was becoming greater, the

quantity of water was lessening and when pumped from considerable depth was so saline as to be deleterious to the trees.    For the District to progress, or even to continue as a fruit locality, it must secure a dependable source of water.    It proceeded therefore, to purchase about 1100 acres of ground riparian to the Kaweah River, and about 5 miles west of McKay Point and this tract was and is throughout the case designated as "The Rancho de Kaweah," or "The Rancho." The St.Johns River runs slightly less than a mile north, the Kaweah River runs through, and a number of plaintiff's ditches run across or near this ranch.

A short distance below The Rancho the Venice Hills, a few foothill peaks and ridges situated westerly from the regular foothill range, serve to divide the delta into what is called the upper delta or basin and the lower delta.    The Kaweah River breaks through these hills in a gap about a mile wide.    The St. Johns through a gap about 300 feet wide, the sandy, gravelly and clay patch soils of the upper basin are about 300 or 400 feet to bedrock.

On this ranch defendant, in 1916, began sinking wells, and at the beginning of this trial, 39 wells had been sunk.    Nearly all of these wells are equipped with electrically operated pumps.    Water is extracted from the soil by the pumps and transported through a pipeline and conduit to the defendant district and there used to supplement the failing water supply for irrigation and domestic uses.    But this expensive outlay was not accomplished without protest before it had begun, for a number of the plaintiff waterusers on the delta, fearing that the taking of water by defendant would deplete their supply, signed and served a written notice of protest.

This is a rough outline of this great legal battle.

The declared policy of the State strongly favors the use of its waters over as great an area of its arid sections as is consistent with economical practices.    It abhors waste.

The following then is the real issue of the case.

If the Defendant's taking does not seriously injure plaintiffs, the law looks with approval upon defendant's enterprise in putting water that would otherwise be wasted, to a beneficial use, thus transforming a large area of dry farming country providing homes for comparatively few families, into a highly developed horticultural district with homes on every few acres.

But on the other hand, if this act, so commendable in the abstract, is accomplished only by taking needed water away from an established district, (and it might with propriety be added, that district being almost wholly within the natural catchment basin of the water taken) surely the law and reason must run along parallel lines in prohibiting the act.    The problem is simple of understanding but the elements necessary to a solution are surprisingly numerous and intricate.    In this Memo-Opinion, I am mentioning only the controlling points of the case supporting my conclusions with little or no detail or argument.

In preparing the formal findings of fact upon which the judgment will be based, I shall incorporate as much detail as may appear to be useful to the parties. And I shall invite full suggestions from all parties.

I have concluded as follows:

The mountain watergathering area of the Kaweah River, supplemented by the rainfall of the valley territories, affords sufficient water in annual quantities for the uses of both plaintiffs and defendant except in very dry years.    I have been unable to discover any plan whereby it may be made available to defendant for the following reasons:

1st.    The taking of water by defendant depletes the sands underlying The Rancho de Kaweah and the territory immediately surrounding the wells to such an extent that the flow of the St. Johns River, the Kaweah River, the Peoples Ditch, Ketchum Ditch and Lane Slough are substantially lessened through ex-

cessive seepage caused by defendant's pumping, thereby depriving plaintiffs of needed water both in quantity and through absorbing greater quantities of water at the beginning of the run and towards the close thereof, materially shortening the periods of the main irrigation season, to-wit, the period of snow melting runoff.

2nd.    The flow from the Kaweah watershed is so varied year to year, season to season, day to day and even hourly, that the taking of water by defendant by its pumps, situated as they are above the intakes of most of the ditches and so as to affect directly the flow in others, secures to defendant the first and only certain water right at the expense of prior appropriators, and does not yield, so far as I have been able to discover, to any practicable method of diverting water to defendant when not needed by plaintiffs. Of course this is unlawful.

Defendant claims the condition just mentioned can be remedied and has offered to provide such remedy by carrying the Kaweah River over the depleted area caused by defendant's pumping, by constructing a cement conduit or by-pass.

No by-pass is proposed for ditches or St. Johns River, for defendant claims it is not responsible for induced ditch seepage and that there is no induced seepage from the St. Johns River. In a separate opinion on the law, I have determined that defendant is responsible for ditch seepage loss if the pumped-out water has not come from a body of water underlying the ranch which is not in fact the very water that runs out of these ditches.    The evidence in the case convinces me that the pumps soon exhaust the water underlying the basin of these pumps, and then draws upon the water belonging to the plaintiffs and flowing in the ditches.    The effect is more than an incident of seepage, it becomes to all intents and purposes a direct taking and defendant has no more right to take such water than it has to take induced seepage water from the Kaweah River.

Defendant also has contended that this river (St. Johns) is perched upon the red and impervious soils practically clear of the porous soils of the delta and therefore does not yield to a great amount of seepage and is not affected to any considerable extent, if at all, by the pumping. I do not believe the technical evidence supports this theory and the apparent physical facts seem to deny it.

During a high-water period of about the year 1862, an obstruction of the Kaweah River sent a portion of the waters (later called St. Johns River) off to the north and against the red soils. It undoubtedly cut into them, but it is hardly likely that it should cut its whole channel through these tighter soils and perch itself upon them, as the defendant claims. It seems more reasonable that the river upon meeting the hard soil would have been diverted along the meeting line of the two soils. Had it plunged into the red soils and through them carved its course, it seems unlikely that it would have persisted after reaching the sands of the old Cottonwood Creek course which extends, at considerable breadth and depth, from the north across the St. Johns and to the Kaweah River. It seems more likely that it, from there at least, would have followed the course of least resistance and taken to the porous and loose sands of the Cottonwood, and especially so, since the gradient was favorable.

It seems to me that the by-pass idea to be effective would then have to be extended to several ditches and to the St. Johns River. But as to the merits of the proposed by-pass, difficulties of intake at the head, difficulties of flooding so as to fill the cone of depression, when a surplus over present needs was present in the river, difficulties of controlling peak of flood heads of the river and consequent damage, all present themselves in such a formidable array as to place the feasibility of the whole scheme in question. This however, I would be inclined to relate in detail which would have to be carefully worked out, if the plan would promise the relief the defendant claims for it.

I am convinced, however, that if the by-pass were constructed or even if all the streams and ditches mentioned were protected from induced seepage, that the removal of any large quantity of water by the pumps would cause a movement of water from greater distances towards the pumps to fill the voids created by pumping, so that instead of being the relief claimed for it, the by-pass would simply extend the intensified cone of depression, causing increased seepage further upstream on the rivers and more seriously affecting the seepage of Peoples Ditch.

It also seems plain to me that the depletion of the sands in and around the Rancho, between periods of refilling would seriously affect the underground movement of water from the upper Kaweah basin, thus resulting in injury to overlying landowner plaintiffs and would deprive water owners of winter waters in the ditches for stock and for small irrigation.   The shortening of the irrigation periods as heretofore mentioned, would be enhanced rather than relieved by this plan.   These reasons impel me to the conclusion that the proposed by-pass will not protect the plaintiffs as it is designed to do.

In arriving at the conclusion that there is flowing past McKay Point and not otherwise appropriated, sufficient water if conserved, to take care of both parties to this action.   I have, for convenience, considered that the surface irrigation area of plaintiffs was 100,000 acres.   The findings will be a little less. I have considered the application of six-inch irrigations as testified by defendant's experts, to be materially too small both because of the physical difficulties such as the porosity of the soil, the surface irregularities and the available head of the irrigation water and the priorities of the different ditches because in this unregulated irrigation system more water can be beneficially used each application.

There can be no good purpose served by applying the State policy of economical use of water to the

point that one fairly irrigated section shall yield water to another section in such manner or at such times as to make two poorly or scantly irrigated sections, or so as to impoverish one to the advantage of the other.

I need hardly say that I am mindful of the importance of these determinations.    The power to so seriously affect the prosperity of many individuals and whole sections of the State is not held by me as a thing to be lightly used.

Months of the best study I have been able to give this subject, months of handling innumerable measurements of water of different periods of years and months have been given to the matter.    I shall frankly admit, with the desire to so arrange a division of the waters as to answer the needs of all parties and cause no considerable injury to anybody.

In this I have not succeeded.    I therefore give defendant 2 weeks in which to present a plan whereby pumping can be controlled so as to take only surplus waters.

It has been said that the learned Judge before whom a trial of this case was started but who did not complete it because of higher honors awarded him, opened each trial day, as with a prayer, with the suggestion that this was a case which should receive the earnest consideration and cooperation of the contending parties, to the end that an amicable settlement should be had outside of court.

It seems that the Judge, upon familiarizing himself with the pleadings, and after perusing the affidavits submitted to him on motion for temporary injunction, sensed the conclusion that the court's power would not be broad enough to permit it to render a constructive judgment.

Not so often, but when and in such manner as I have deemed appropriate I have given voice to the same idea.    The realization of this prayer seemed all

but accomplished at one time.    The conferees it cannot be denied were face to face with great difficulties. It failed.

At the risk of appearing presumptuous and after having indicated my conclusions as hereinabove expressed, I again approach the subject of compromise.

I propose for the consideration of the parties hereto, that each side view this litigation, not solely as a private matter but as both a private and a public matter.    And that circumstances justify an agreement not wholly controlled by legal rights.    That the following suggestions with such modification as may be deemed desirable, be the course of amicable action.

1st.    That findings, full as can be thought useful, be worked out.    And that judgment be entered in accordance therewith.

2nd.    That the judgment be stayed, with full protection to all parties, for a period of five years.

3rd.    That the temporary injunction now in force be continued during this time, unless cancelled or modified by agreement.

4th.    That immediately, a joint engineering force proceed to study the feasibility, in all its phases, of impounding the waters of the Kaweah at some appropriate place between Three Rivers and McKay Point. I have given this matter some thought, and am of the opinion that it is physically practicable and would result in making the Kaweah run-off a regulated irrigation system with water sufficient to serve everybody herein involved, without injuring other diverters and to the material advantage of all.    Such a project would also probably produce electrical energy of sufficient value to pay maintenance.

I shall hold myself in readiness to assist along these suggestions, but if I am not informed within two weeks that the proposal here made is acceptable in principle I shall direct the drawings of findings in the regular way.

Albert Lee Stephens, Judge.